FAIRES *v.* DUPREE.

4-8005                                    197 S. W. 2d 735

Opinion delivered December 2, 1946.

*Glenn G. Zimmerman* and *F. W. A. Diermann,* for appellant.

*John L. Sullivan* and *E. B. Dillon,* for appellee.

GRIFFIN SMITH, Chief Justice.    The question is whether Circuit Court erred when it instructed a verdict for the defendant following plaintiff's testimony relating to actual and exemplary damages to his land and its incidents.

Pat Hogan, one of the defendants, was manager of Greater Little Rock Stock Yards, and cooperated with

Dupree in maintaining a hog ranch. Dupree contracted with the Federal government for garbage, and in respect of this venture he and Hogan were partners. For an undisclosed period the stockyard was incorporated. Hogan acquired ownership and testified, "It is operated as an individual, so I accept all responsibility of the [former] Company." It was conceded an arrangement was entered into with Dupree by which he was to supervise hog feeding.

At a pre-trial conference the Court directed that there be eliminated from the complaint certified copy of an injunction issued by Pulaski Chancery Court, restraining the defendants from feeding hogs on property so near land owned by the plaintiff that consequential odors and other contamination became unbearable, or virtually so. It is also alleged in the motion for a new trial that the Court erred in striking Sec. 12 from the complaint, thereby preventing the plaintiff from pursuing his legal right to exemplary damages.

A temporary injunction was issued May 20, 1941, and made permanent July 23d of the same year. The suit for damages resulting in this appeal was brought five days after the order of July 23d, but the complaint was amended February 21, 1942.

After testifying that he had "lived out there" probably thirteen or fourteen years, appellant (a carpenter then taking irregular employment) described relative positions of the five acres he owned and the ten acres used by defendants. Appellant's [home] faced south on Lee avenue, while defendants' land was to the north, with back fences joining. It is undisputed that a steep grade leads from the area used for feeding hogs to the property occupied by appellant.

When the "hog ranch," as it is referred to, began functioning, the quantity of garbage brought from Camp Robinson was 75 [to] 100 barrels per day. According to appellant, the so-called feed, deposited on the ground, accumulated to a depth of two feet. When the hogs began "working on that, it began running over my garden."

Later appellant testified: "The garbage was dumped on the slope of that ground. . . . I didn't dream the hogs would be brought out there by the thousands. The seepage washed down, making the garden spot so wet it couldn't be planted that fall or the following spring. . . . It filled the spring I had dug, polluting the water and [infested it] with maggots."

Testimony given by Lee Scrape, a bookbinder residing on West Lee avenue, corroborates appellant. Excerpts are copied in the margin.[1]

The Court, in a lengthy summary before directing the jury to find for defendants, expressed the view (a) that there was no evidence regarding the quantity of vegetables appellant's garden would have produced if it had not been flooded—nothing to show the value. (b)

---

[1] Lee Scrape testified in part as follows: "The garbage was brought in and poured on the ground. Raw bones and carcasses were all thrown in. This kept getting deeper and deeper. Hogs tramped through it and it got to where it was almost unbearable. I was living out there with my mother and sister and two children, but moved them away. I stayed out there at night myself. When I came in at evening the green flies and all kinds of flies in the yard—all different colors and sizes—would light on the car. It drove me fractious. I didn't know what to do. One time I attempted to hit a branch on a bush and scare [the files] off. I noticed they had accumulated there and died. I have seen animals where they have drowned in floods and [the carcasses] had a very bad odor, but it wasn't anything like this; this is the worst thing I ever saw, and it kept getting worse. I don't understand how people stayed around it.

"The [garbage] was running down the sides of the hill into the branch. At the time I was over there after a little rain I saw a big bunch of white stuff and went up and examined it. It was what I call maggots of some kind and there were several piles of them—you could have taken a spade and spaded them up. I was on a committee that was trying to get something done and I didn't know whether to move away from the place [I occupied adjoining Mr. Faires] or not. We had several meetings and finally ended up getting an injunction, but it was two years before the odor was finally cleared up.

"I did go over on the property after the people moved. I didn't do any more than walk through there. The stuff was so deep. [People] would go in there and get the bones out, I suppose, to sell.

"The spring was ruined. He couldn't even water his cow out of it. We used to go down there and get that spring water and use it. As a matter of fact we thought it fine water. When our pipe line was frozen for a month we used that water for drinking, cooking and everything.

"At the time I moved my family Mr. Faires was sick and complaining of losing weight and showed me how his clothes didn't fit him and he was vomiting. My sister's children were vomiting—that is when we moved them away."

Although loss of the spring was undisputed[2] its worth was speculative. (c) In respect of appellant's testimony that he had lost 20 or 30 pounds in weight because of the terrible odor, there was failure upon appellant's part to prove the number of days he lost from work on account of illness occasioned by the nuisance. (d) Although the complaint alleged loss of thirty hens, "according to the Court's recollection he said these chickens wandered off." (e) Compensation asked because appellant's cow was affected—a reduction in milk, inflammation of the udder, etc.,—would have to be disregarded because of a failure to show what the decrease was, and conjecture had no place in the transaction.

*First (a)*—The Court correctly held that evidence was insufficient on the allegation that appellant's garden had been injured to the extent of $200. There is no testimony a garden had been planted; only a nebulous suggestion that financial loss actually occurred. A rule is that where crops are so immature when destroyed as to have no market value, the measure of damage is that for which the land would have rented. *St. L. I. M. & S. R. Co.* v. *Saunders,* 85 Ark. 111, 107 S. W. 194; *Brown* v. *Arkebauer,* 182 Ark. 354, 31 S. W. 2d 530; but if the crop has grown to a point where it can be said with reasonable certainty that a stated production would result, then damage is the value of such crop. *Crumbley* v. *Guthrie,* 207 Ark. 875, 183 S. W. 2d 47.

*Second (b)*—In matters of this kind one's ordinary experiences do not qualify him to say (with that fine degree of accuracy a perfectly poised judicial mind would consider absolute) how much a man has suffered financially because of tortiously-imposed filth. It is undisputed that bones, with putrified particles of meat adhering to them; colonies of maggots, soil saturated with odoriferous seepage, and green flies and other varieties

---

[2] Regarding the spring, the Court said: "It has been shown that the water was polluted and [its use] destroyed; but there is no evidence to show what the loss was. The only thing would be the loss of so much water if [appellant] had to purchase it for his cow; [that is], if he had to purchase one hundred or two hundred gallons, then we would have a definite amount; [otherwise] it is a matter of speculation."

in droves emphasized the conditions to which appellant was subjected. As to the flies, there were "millions" (it was said) to be seen promiscuously decaying in heaps on limbs of trees. These things created a situation wholly incompatible with the sensibilities of residents whose olfactory organs had not been overstrained.[3] In spite of this evidence perhaps it cannot be said (and the Court so held) that the complaining party had suffered an ascertainable monetary loss because the spring was invaded. But it does not follow that there was no damage to the freehold.

*Third (c)*—Appellant's testimony that he lost from twenty to thirty pounds in weight, was sickened by reason of the stench, flies, and filth,—these things were for the jury's consideration. Periods of vomiting, nausea, and general debility are shown to such an extent that the fact-finders should have been permitted to say whether appellant's illness was produced by the imposition of things complained of or whether he was overstating the corrupting causes.

*Fourth (d)*—In his direct examination appellant testified thirty hens were killed by the wrongful acts which caused insanitation. However, on cross-examination, there was an admission that the fowls wandered off— "went up the branch"—and did not return. The Court was correct in holding that the fact that they might have died in the circumstances described was not substantial evidence that they did die as alleged.

*Fifth (e)*—While it is true, as the Court held, that the complaint did not assert that milk production was reduced in a definite amount, appellant testified that his cow was in very bad condition for two or three months, ". . . and I would say she dropped from about three gallons to about a gallon, or a fraction more than a gallon." The witness added that ". . . for a considerable length of time" the milk, because of its [bad] qual-

---

[3] Testimony regarding the flies might be read in connection with Biblical references to locusts. 3c Rev., ch. 9, v. 2-12: ". . . And they had tails like unto scorpions, and there were stings in their tails: and their power was to hurt men five months."

ity, could not be used, and the loss, including remuneration for imposed care, amounted to $50. This was sufficient to go to the jury.

The complaint did not allege depreciation in value of the property through maintenance of the nuisance; but evidence on this point was introduced, and the pleadings will be treated to conform.

Appellant testified that the Home Owners' Loan Corporation made a "low" estimate of $2,500 on the property for mortgage purposes; that he (appellant) endeavored to realize this amount when he sold, but accepted $1,700. Inferentially, the $2,500 valuation was made shortly before the hog ranch was established. It is in evidence that the contaminating odors continued for two years after use of property for feeding had been discontinued. Destruction of the spring could have accounted for price depreciation. In any event, that is a matter subject to proof on retrial.

It was not improper, when the pre-trial conference was held, to direct that the injunction evidence, as certified, be eliminated. However, when the case was developed in Circuit Court on claim of punitive damages, it was competent to show by appropriate proof that the defendants had been restrained, and that they were operating in defiance of the order of abatement. Certainly violation of an injunction in the circumstances would be a matter for the jury to consider in determining whether the accused acted in a defiant and wanton manner.

Since the judgment must be reversed and the cause remanded for a new trial, it is not necessary to discuss the character of testimony tending to show that the $800 difference between *prima facie* value and what the property sold for was attributable to appellants' wrongful conduct.

Reversed, with directions that the cause be retried.